Filed 12/9/13  P. v. Garcia CA2/5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CESAR GARCIA et al.,<br><br>    Defendants and Appellants. | B244293<br><br>(Los Angeles County<br>Super. Ct. No. PA067947)<br><br>ORDERS MODIFYING OPINION<br>AND DENYING REHEARING<br>PETITION<br><br>[CHANGE IN JUDGMENT] |

The opinion filed November 14, 2013, is modified as follows.  On slip opinion page 13, delete:

"The section 4019 formula yields the following results.  All appellants were arrested on June 1, 2010.  Ortiz was sentenced on October 31, 2012.  He is entitled to 884 days of actual time and 442 days of conduct credit for a total of 1326 days.  Garcia was sentenced on September 26, 2012.  Garcia is entitled to 842 actual days and 420 days of conduct credit for a total of 1,262 days.  Montelongo was sentenced on September 24, 2012.  He is entitled to 846 actual days and 422 days of conduct credit for a total of 1,268 days."

In its place, insert:

"The section 4019 formula yields the following results.  All appellants were arrested on June 1, 2010.  Ortiz was sentenced on October 31, 2012.  He is entitled to 884

days of actual time and 442 days of conduct credit for a total of 1326 days. Garcia was sentenced on September 26, 2012. Garcia is entitled to 849 actual days and 424 days of conduct credit for a total of 1,273 days. Montelongo was sentenced on September 24, 2012. He is entitled to 847 actual days and 422 days of conduct credit for a total of 1,269 days."

On page 14 of the slip opinion, delete:

"(2) Cesar Garcia is entitled to custody credit consisting of 842 actual days and 420 conduct credit for a total of 1,262 days;

(3) Michael Montelongo is entitled to custody credit consisting of 846 actual days and 422 days of conduct credit for a total of 1,268 days;"

In its place, insert:

"(2) Cesar Garcia is entitled to custody credit consisting of 849 actual days and 424 conduct credit for a total of 1,273 days;

(3) Michael Montelongo is entitled to custody credit consisting of 847 actual days and 422 days of conduct credit for a total of 1,268 days;"

The rehearing petition filed December 2, 2013, is denied.


_____      _____      _____
KUMAR, J.[*]                MOSK, Acting P.J.           KRIEGLER, J.

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 11/14/13  P. v. Garcia CA2/5 (unmodified version)

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B244293 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA067947) |
| v. | |
| CESAR GARCIA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Dalila C. Lyons, Judge.  Affirmed with directions.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant Cesar Garcia.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant Adam Ortiz

Comar Law and D. Inder Comar, under appointment by the Court of Appeal, for Defendant and Appellant Michael Angelo Montelongo.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

Following a jury trial, appellants Adam Ortiz, Cesar Garcia and Michael Montelongo were found guilty of first degree residential burglary (Pen. Code, § 459)[1] and attempted first degree residential burglary (§§ 459, 664). The jury also found the offenses were committed for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)). Garcia admitted having a prior conviction within the meaning of section 667.5, subdivision (b). Montelongo admitted having a prior conviction within the meaning of sections 1170.12, subdivisions (a) through (d), 667, subdivision (a)(1) and 667.5, subdivision (b). A state prison sentence was imposed for all three men as follows: Garcia—13 years, 4 months; Ortiz—14 years, 4 months; and Montelongo—21 years.

Appellants contend there was insufficient evidence to support the verdicts of attempted first degree burglary and the finding that the crimes were gang related. They also argue the trial court incorrectly instructed the jury on the elements of attempted burglary. We find the evidence of attempted burglary sufficient and, although the trial court misinstructed on an element of attempted burglary, the error was harmless beyond a reasonable doubt. These contentions are, therefore, rejected.

Errors are also alleged with respect to the abstracts of judgment. Appellants contend the trial court incorrectly calculated their presentence custody credit. Garcia contends the restitution and parole revocation fines must be stricken from the abstract of judgment because they were not orally imposed by the trial court. Montelongo argues, although the trial court imposed the middle term for attempted burglary, the abstract of judgment reflects the trial court imposed the upper term. For the most part, respondent concedes these errors. We accept respondent's concessions, find appellants' claims meritorious, and order the abstract of judgment modified accordingly.

---

[1] All further statutory references are to the Penal Code.

## I.  FACTS

### A.  Prosecution

#### 1.  The Offenses

Diana Davtyan was the named victim of the attempted burglary charge.  On June 1, 2010, at approximately 12 noon, a young female with black hair in a ponytail knocked on the front door of Davtyan's home on Creemore Drive in Tujunga.  When Davtyan answered the door, the woman asked if "Steve" lived at the residence.  Davtyan indicated there was nobody by that name living at the house and closed her door.  Approximately 30 minutes later, when Davtyan was outside her home, she observed the woman walking between Davtyan's home and the home of Terri McIntee—Davtyan's next-door neighbor.  The woman told Davtyan that she had not located Steve and walked toward a white or gold van.

At approximately 12:30 p.m., Joanne Pope heard someone continuously ringing her doorbell and pounding on her door to her home on Creemore Drive.  She observed a Hispanic woman with long dark brown or black hair walk past her window.  Pope was alone in the house and chose not to open the door because the circumstances seemed abnormal.  The woman left the doorway and walked to a van that was parked in front of Sharon Paczkowski's home, next-door to Pope's home.

When the woman entered the van, two Hispanic men got out of it.  The men walked toward Pope's home, and walked between her home and Paczkowski's home.  After Pope's dog began barking, the men returned to the van.  A third man exited the van and walked up Paczkowski's driveway.  Pope lost sight of him and, after a few minutes, the man appeared and returned to the van.

Pope called Paczkowski, explained her observations, and then called 911.  The van proceeded up the street and stopped.  The third man exited the van and walked up

3

Paczkowski's driveway and returned to the van as he had done previously. The van did not have any license plates.

In response to the 911 call, Los Angeles Police Officer Matt Siebert and his partner Officer Abraham Rivera arrived in the area of Creemore Drive at approximately 1:00 p.m. to look for a vehicle matching the description of a silver Chrysler Pacifica. He observed codefendant Tatiana Thibes[2] sitting in the driver's seat of a vehicle matching the description. The back window of the vehicle was smashed and the vehicle did not have any license plates. Seibert drove next to Thibes and spoke with her. Thibes indicated she had been in an argument with her boyfriend and he had broken the window.

The officer continued up the street, made a U-turn and returned to Thibes. He asked Thibes if she was okay and she replied, "Yes." The officers drove away but continued to monitor the van. The van pulled away from the curb at a high rate of speed. Siebert temporarily lost sight of the van. Siebert made a U-turn and drove west on Creemore Drive. The gate of a residence at the intersection of Pali Avenue and Creemore Drive was open. The officers were flagged down by a woman who indicated she observed three men jump a fence on the corner of Pali Avenue and Creemore Drive.

The officers turned onto Pali Avenue and observed the van with three Hispanic males inside, parked along the curb. The van pulled away and the officers pursued it at a high rate of speed. The vehicle ran through two stop signs and eventually crashed at the onramp to the 210 Freeway. Thibes and appellants were removed from the van and arrested. Pope arrived on the scene and indicated she was confident the van was the same one she had previously observed. She said appellants' haircuts, skin color and height were similar to the three men she had previously seen.

Appellants were each carrying a $100 bill. The van contained several rubber gloves, a knife, two screwdrivers, a small black hammer and a blue backpack.

Terri McIntee's home was ransacked. A gate to the home had been pulled open and the sliding glass door at the rear of the house was open. Her dog was in a carrier

---

[2] Thibes is not a party to this appeal.

4

rather than the "playpen" she had left it in. There were pillowcases in the backyard full of computers, cameras, and jewelry from the bedrooms. Various electronics were scattered throughout the house. Mattresses in the bedrooms were flipped up. Three $100 bills were missing from a graduation card in her daughter's bedroom. Additionally, fresh pry marks were discovered on Paczkowski's front door.

## 2. Gang Evidence

The prosecutor's gang expert was Los Angeles Police Officer Jason Abner. He had been a police officer for over 16 years and worked with the gang enforcement detail for 4 years. He was assigned to monitor the Temple Street gang. The primary activities of the gang included homicide, robbery, burglary, felony vandalism and weapons possession. These activities produced revenue and benefitted the gang by instilling fear of the gang in the community.

The Temple Street gang was not active in Tujunga. The gang insignia included "Temple," "TST," "VTR" and a "T" formed by one's hand.

Abner personally knew Garcia and Ortiz. Garcia had a tattoo on his neck of a needle with a "T" and "Street" across the "T." He had a "T" near his right eye and three dots by his left eye signaling "my crazy life." Ortiz had the following tattoos: "Temple" across his back and neck; "TST" on the side of his head; "T" near his left eye; "PWLS" above his right eyebrow, which was an abbreviation for the Temple Street "peewee locos" clique; "1923" across his chest, which was the year Temple Street was organized; "Westside" across his stomach denoting the part of Los Angeles west of the 110 Freeway; and a female wearing a hat with a "T" on it. Both men admitted to being members of the Temple Street gang.

Abner knew about Montelongo from his conversations with two other officers. Montelongo had "Temple" tattooed across his chest and "Westside TST" tattooed across his entire back. Like his cohorts, he admitted membership in the Temple Street gang.

5

After given a hypothetical consistent with the facts of the case, the officer opined appellants' conduct was "definitely in association with a gang." Additionally, committing the crimes in Tujunga was monetarily beneficial to the gang because of a reduced risk that the families of the gang members would be affected and, because the area was affluent, the gang members were more likely to have opportunities to steal valuable merchandise.

## B. Defense

A college professor, Bill Sanders, taught courses in criminology, juvenile justice, gangs and drug use. He had 10 publications addressing gang culture but was not specifically familiar with the Temple Street gang. In his opinion, gang members commit robberies and burglaries for their individual benefit and do not share the loot with the gang.

## II. DISCUSSION

## A. Challenges to the Sufficiency of the Evidence

In reviewing a challenge to the sufficiency of the evidence, we "consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432, fn. omitted.) Our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) The standard of review is the same in cases where the prosecution relies primarily on circumstantial evidence. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11; *People v. Stanley* (1995) 10 Cal.4th 764, 792.) "Reversal on this

6

ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331, quoting *People v. Redmond* (1969) 71 Cal.2d 745, 755.)

### 1. Attempted Burglary

"Every person who enters any house . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459.) "Every burglary of an inhabited dwelling house . . . is burglary of the first degree." (§ 460.) "An attempt to commit a crime requires the specific intent to commit the target crime . . . and a direct but ineffectual act, beyond mere preparation, done towards its commission." (*People v. Booker* (2011) 51 Cal.4th 141, 175.)

"Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, citing § 31.) "'[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Gonzales* (2011) 52 Cal.4th 254, 295-296, quoting *People v. Beeman* (1984) 35 Cal.3d 547, 561.)

"Whether a person has aided and abetted in the commission of a crime is a question of fact, and on appeal all conflicts in the evidence and attendant reasonable inferences are resolved in favor of the judgment. Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5, fn. omitted; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

A rational trier of fact could have concluded that when Thibes knocked on Davtyan's door she was working with appellants to find a home to burglarize. This is based on the activities that followed her initial interaction with Davtyan.

After Thibes knocked on Davtyan's door and walked between her home and that of McIntee (the burglary victim), she returned to the van containing appellants. Thibes then proceeded to the Pope home where she pounded on the door and rang the doorbell. She returned to the van whereupon two men jumped out and walked between Pope's home and that of Paczkowski, and then a third man exited the van and approached the Paczkowski home. It was ultimately determined McIntee's residence was burglarized and there were fresh pry marks on the door of the Paczkowski home.

The group was together when they were in the van in front of the Davtyan home, when they fled from the police, and when they were apprehended. The van contained burglary tools and each man was in possession of a $100 bill—no doubt accounting for the three $100 bills missing from the McIntee bedroom. A rational trier of fact could have concluded the group had a plan to burglarize an unoccupied home in the area, that Thibes was taking the first step toward burglarizing the Davtyan residence when she knocked on the door, and that the men aided, encouraged or facilitated her in her efforts to complete a burglary of the home consistent with their plan.

### 2. The Gang Enhancement

"Section 186.22, subdivision (b)(1) imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang. To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.)

Appellants join in the arguments of one another and appear to make to attack the sufficiency of the evidence supporting the gang enhancement on two grounds. First, they

argue there was insufficient evidence the crimes were committed "for the benefit of, at the direction of, or in association with" the Temple Street gang. Second, they maintain there was insufficient evidence that one of the primary activities of the Temple Street gang was to commit a statutorily identified felony. Their arguments lack merit.

### a. The Benefit/Direction/Association Element

By using the disjunctive, the Legislature has provided three options of satisfying this element in that the crimes may be committed: (1) for the benefit of a gang; (2) at the direction of a gang; *or* (3) in association with a gang. (§ 186.22, subd. (b)(1).) Because we find there was sufficient evidence supporting the third option, the remaining two options are not addressed.

The prosecution's gang expert opined the conduct underlying the offenses was "definitely" committed in association with a criminal street gang. Appellants were admitted members of the Temple Street gang and had multiple tattoos signaling their membership in the gang. They committed the crimes together, fled together, and were apprehended together. Each of them had a one-third share of the cash stolen from the McIntee bedroom in his possession. The fact that each appellant committed the crime in concert with known fellow gang members amounted to sufficient evidence the crimes were committed in association with Temple Street gang. (See *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members"]; see also *People v. Leon* (2008) 161 Cal.App.4th 149, 163 [where the prosecution presented evidence defendant committed crimes "in association with . . . , a fellow gang member," there was sufficient evidence defendant "committed the offenses 'in association with any criminal street gang'"].)

9

### b. Temple Street's Primary Activities

"[T]he trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322.) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members. . . . [¶] Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at pp. 323-324.) "The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities. [Citations.]" (*People v. Duran, supra,* 97 Cal.App.4th at p. 1465.)

Officer Abner, the prosecution's gang expert, had been a police officer for over 16 years and spent the past 4 years in the gang enforcement detail. He had spoken to at least 100 Temple Street Gang members and participated in "hundreds" of investigations involving Temple Street gang members. Officer Abner contacted Temple Street gang members "almost on a daily basis." It was his opinion that the primary activities of the Temple Street gang were "homicides, robberies, burglaries, felony vandalisms, weapons possession, [and] carrying concealed weapons." He explained Temple Street engaged in these activities "frequently" and "more often" than other crimes.

The crimes identified by the officer were qualifying felonies for the "primary activities" element of the gang enhancement. (§ 186.22, subds. (e)(2) [robbery], (e)(3) [homicide]; (e)(11) [burglary]; (e)(20) [felony vandalism]; (e)(23) [weapons possession]; (e)(32) [carrying a concealed firearm].) In light of Officer Abner's personal interaction with Temple Street gang members and hundreds of investigations into crimes involving

10

those gang members, his testimony that these "frequent" offenses were the primary activities of the gang amounted to sufficient evidence on this element of the enhancement. (See *People v. Vy* (2004) 122 Cal.App.4th 1209, 1219 [testimony that aggravated assaults and attempted murder "were among . . . the primary activities" of the gang proved primary activity element]; see also *In re Ramon T.* (1997) 57 Cal.App.4th 201, 207 [testimony gang "engaged in several of the crimes listed in section 186.22 as a primary activity" proved primary activity element].)

## B.  The Instruction on Attempted Burglary

The trial court has a sua sponte duty to instruct on the elements of the crime of attempt when charged. (See *People v. Breverman* (1998) 19 Cal.4th 142, 154.)[3]  Here, the trial court did not accurately instruct the jury on the attempted burglary. Specifically, the trial court was obligated to instruct the jury that attempted first degree burglary required a direct but ineffective step toward committing the target offense, i.e., first degree burglary and an intention to commit the target offense. (*People v. Booker, supra,* 51 Cal.4th at p. 175.)  However, the trial court mistakenly identified the target offense as "attempted" burglary rather than burglary.

The trial court's error amounts to a misinstruction on an element of the offense and requires reversal of the judgments of conviction for attempted burglary unless it can be determined that the error was harmless beyond a reasonable doubt. (*People v. Wilkins* (2013) 56 Cal.4th 333, 348-350; *People v. Hayes* (1990) 52 Cal.3d 577, 628.)  Although Thibes is not a party to this appeal, she was charged with appellants and tried at the same time as appellants.  The jury was instructed that there are two possible theories of liability—a person could be guilty if he or she personally committed the crime or if the

<hr/>

[3]  We reject respondent's argument that appellants' failure to object to the instruction resulted in their forfeiture of the claim on appeal. (*People v. Mason* (2013) 218 Cal.App.4th 818, 823 ["Instructional error as to the elements of an offense is not waived by trial counsel's failure to object."].)

person aided and abetted in the commission of the crime. The evidence established it was Thibes who took the direct but ineffective step toward committing a burglary by proceeding onto Davtyan's property and knocking on the door. Indeed, this was the prosecutor's argument to the jury. Thus, appellants' liability for attempted burglary was as aiders and abettors of Thibes's conduct.[4]

Other than the misinstruction, the concept of an attempt to commit an attempted burglary was absent from this case. The prosecutor properly identified the elements of attempted burglary in closing argument when he stated: "[H]ere are the elements now of attempt. [¶] Element number 1, defendant took a direct but ineffective step toward committing *the burglary*. The defendant, in element number 2, intended to commit *the burglary*." (Italics added.) Although counsel for Ortiz and Garcia did not specifically address the elements of attempted burglary, counsel for Montelongo stated, "A direct step indicates a definite, unambiguous intent to commit *the burglary* . . . ." (Italics added.)

In addition, the verdict forms required a finding that appellants were guilty of "ATTEMPTED BURGLARY," as opposed to the somewhat amorphous concept of an attempt to commit an attempted burglary. Finally, it bears repeating, as discussed in Part II(A)(1), the evidence strongly demonstrated the group was working *together* to find a home to burglarize and appellants aided and abetted the first step in burglarizing the Davtyan home, i.e., to ensure the home was not occupied. Any error in the misstatement of the trial court when instructing the jury on attempted burglary was harmless beyond a reasonable doubt. (See *People v. Battle* (2011) 198 Cal.App.4th 50, 76-78 [court incorrectly instructed the jury defendant could be found guilty of felony murder based on *attempted* lying in wait but the error was harmless because, given the evidence, a reasonable jury could only conclude defendant was guilty on a theory of lying in wait].)

---

[4] Appellants do not contend the aiding and abetting instruction was incorrect.

12

## C. Presentence Custody Credit

Respondent submits appellants' conduct credits were properly limited to 15 percent of their actual presentence custody time because they were convicted of burglary which, according to respondent, qualified as a violent felony (§ 667.5, subd. (c)(21) and thereby mandated the credit limitation pursuant to section 2933.1, subdivision (a). However, burglary qualifies as a violent felony under section 667.5, subdivision (c)(21) only if "it is charged and proved that another person, other than an accomplice, was present in the residence during the commission of the burglary." This requisite charge and finding was not made in this case. Thus, appellants' presentence conduct credits were subject to the calculation set forth in former § 4019, subdivisions (b)(2), (c)(2) and (f), i.e., six days for every block of four days actually served. (See *People v. Smith* (1989) 211 Cal.App.3d 523, 527; see also *People v. Bravo* (1990) 219 Cal.App.3d 729, 732-735.)

The section 4019 formula yields the following results. All appellants were arrested on June 1, 2010. Ortiz was sentenced on October 31, 2012. He is entitled to 884 days of actual time and 442 days of conduct credit for a total of 1326 days. Garcia was sentenced on September 26, 2012. Garcia is entitled to 842 actual days and 420 days of conduct credit for a total of 1,262 days. Montelongo was sentenced on September 24, 2012. He is entitled to 846 actual days and 422 days of conduct credit for a total of 1,268 days.

## D. Garcia's Restitution Fines

The abstract of judgment reflects $240 fines imposed on Garcia pursuant to sections 1202.4, subdivision (b)(1) and 1202.45. Because the trial court never orally imposed those fines, we accept respondent's concession the abstract of judgment must be corrected to delete them. (*People v. Farrell* (2002) 28 Cal.4th 381, 384, fn. 2 [court's oral pronouncement of sentence trumps inconsistency in the minutes]; *People v. Tillman*

(2000) 22 Cal.4th 300, 303 [the People are prohibited from challenging the failure to impose a section 1202.4, subdivision (b) fine for the first time on appeal].)

## E.  Montelongo's Abstract of Judgment

The trial court imposed the middle term for Montelongo's commission of burglary.  However, the abstract of judgment contains a "U" in the "Term" category signaling that he received the upper term.  We accept respondent's concession that the abstract of judgment should be corrected such that the "U" should be changed to an "M." (See *People v. Farrell, supra,* 28 Cal.4th at p. 384, fn. 2.)

## II.  DISPOSITION

The trial court is ordered to correct the abstracts of judgment in the following respects:

(1)  Adam Ortiz is entitled to custody credit consisting of 884 days of actual time and 442 days of conduct credit for a total of 1,326 days;

(2)  Cesar Garcia is entitled to custody credit consisting of 842 actual days and 420 conduct credit for a total of 1,262 days;

(3)  Michael Montelongo is entitled to custody credit consisting of 846 actual days and 422 days of conduct credit for a total of 1,268 days;

(4)  The $240 restitution fines imposed pursuant to pursuant to Penal Code sections 1202.4, subdivision (b)(1)  and 1202.45 are to be deleted from Cesar Garcia's abstract of judgment; and

(5)  The "U" signifying an upper term sentence for burglary on Michael Montelongo's abstract of judgment is to be deleted and an "M" is to be inserted in its place to represent a middle term sentence that was doubled pursuant to the Three Strikes law (Pen. Code, § 1170.12, subd. (c)(1)).

14

After the abstracts of judgment are corrected, the trial court clerk is ordered to provide the Department of Corrections and Rehabilitation with a copy of those corrected documents.  In all other respects the judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KUMAR, J.[*]


We concur:


MOSK, ACTING P. J.


KRIEGLER, J.

_____

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15